# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

HEATHER M. GEE,         )
                                  )
        Plaintiff,        )
                                  )
        vs.            )        Case No. 1:06CV 82 RWS(LMB)
                                  )
MICHAEL J. ASTRUE,[1]     )
Commissioner of Social Security,    )
                                  )
        Defendant.    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

      This is a proceeding under 42 U.S.C. § 405(g) for judicial review of the defendant's final decision denying Heather M. Gee's application for child's Supplemental Security Income benefits under Title XVI of the Social Security Act. This case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 42 U.S.C. § 636(b). Plaintiff has filed a Brief in Support of Complaint. (Document Number 18). Defendant has filed a Brief in Support of the Answer. (Doc. No. 19).

### Procedural History

      On April 8, 2004, plaintiff's mother, Katherine Gee, filed an application for benefits on plaintiff's behalf, claiming that plaintiff became disabled on January 1, 1991. (Tr. 43-45). This

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 15, 2005. (Tr. 37-41,13-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 2, 2006. (Tr. 9, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on June 20, 2005. (Tr. 186). Plaintiff was present and was unrepresented. (Id.). Plaintiff's mother and father, Katherine and William Gee, were also present. (Id.).

The ALJ then questioned Mr. and Mrs. Gee regarding proceeding without an attorney. (Tr. 189). Mrs. Gee testified that she did not think they needed an attorney at the hearing. (Id.). Mrs. Gee stated that she did not try to contact an attorney. (Id.). Mr. Gee testified that he has lung cancer and is disabled. (Tr. 190). Mrs. Gee stated that the family's only source of income is Mr. Gee's disability benefits. (Id.). The ALJ advised Mr. and Mrs. Gee of their right to representation at the hearing. (Id.). The ALJ informed Mr. and Mrs. Gee that they would not have to pay out of their pocket for an attorney. (Id.). The ALJ stated that four out of five claimants are represented by an attorney. (Tr. 191). Mr. and Mrs. Gee testified that they understood their right to an attorney and wished to proceed without representation. (Id.). Mrs. Gee stated that she has an eleventh grade education. (Tr. 192). Mr. and Mrs. Gee testified that

they did not have any emotional or mental problems that would affect their ability to understand at the hearing. (<u>Id.</u>).

The ALJ admitted a number of exhibits into the record. (Tr. 193). The ALJ then gave Mrs. Gee time to review the report of Dr. Ben Lanpher. (Tr. 194). Mrs. Gee indicated that she did not object to Dr. Lanpher's report. (<u>Id.</u>). The ALJ admitted Dr. Lanpher's report into the record. (<u>Id.</u>).

The ALJ then examined plaintiff, who testified that she was seventeen years of age. (Tr. 196). Plaintiff stated that she was not in school because she was expelled in March. (<u>Id.</u>). Plaintiff testified that she had problems at school because she fought all the time. (Tr. 197). Plaintiff stated that she also had problems with her school work and that she took special education classes. (<u>Id.</u>). Plaintiff testified that she had taken all special education classes since she started school. (<u>Id.</u>). Plaintiff stated that she was never held back a grade. (<u>Id.</u>). Plaintiff testified that she had problems learning because she could not sit still and she had difficulty comprehending her school work. (Tr. 198). Plaintiff stated that she had difficulty with all subjects. (<u>Id.</u>).

Plaintiff testified that she fights with kids at school when they say bad things about her. (<u>Id.</u>). Plaintiff stated that she got into fights every day at school, sometimes twice a day. (Tr. 198-99). Plaintiff testified that she fought with different people rather than a specific person or group. (Tr. 199). Plaintiff stated that she was suspended many times before she was expelled. (<u>Id.</u>). Plaintiff testified that she was also suspended many times in ninth and tenth grade. (<u>Id.</u>). Plaintiff testified that she received in-school suspensions as well. (<u>Id.</u>). Plaintiff stated that she

used to receive good grades, but her grades started slipping when she began hating school.  (Id.).

Plaintiff testified that her knee hurt during the hearing because her brother punched her in the knee.  (Tr. 200).  Plaintiff stated that she has hearing problems in both ears.  (Id.).  Plaintiff testified that she has to talk loudly because she cannot hear herself speak.  (Id.).  Plaintiff stated that she has had tubes inserted in her ears but they do not work.  (Id.).  Plaintiff testified that she also has difficulty hearing other people.  (Id.).  Plaintiff stated that she is not receiving treatment for her hearing loss.  (Tr. 201).

Plaintiff testified that she has asthma.  (Id.).  Plaintiff stated that she has difficulty breathing when she walks more than a block.  (Id.).  Plaintiff testified that the weather affects her asthma.  (Id.).  Plaintiff stated that her chest starts to hurt and she has difficulty breathing when the weather changes.  (Id.).

Plaintiff testified that she has difficulty standing.  (Id.).  Plaintiff stated that her legs get tired after she stands for ten minutes.  (Tr. 202).  Plaintiff testified that her legs start to hurt and she has to sit down after ten minutes.  (Id.).  Plaintiff stated that her legs stop hurting when she sits down.  (Id.).

Plaintiff testified that she experiences difficulty lifting.  (Id.).  Plaintiff stated that she cannot lift twenty pounds.  (Id.).  Plaintiff testified that she cannot lift her television, which weighs about twenty pounds.  (Id.).

When asked what her most serious problem was, plaintiff responded "I think I'm retarded."  (Id.).  Plaintiff explained that while her classmates were able to learn fast, she had difficulty comprehending material.  (Tr. 202-03).  Plaintiff testified that her classmates made fun

of her because she cannot read well.  (Tr. 203).

Plaintiff stated that her classmates did not like her because she is "mean," and she fights all the time.  (Id.).  Plaintiff testified that she does not get along with the kids in the neighborhood either.  (Id.).  Plaintiff stated that she prefers to stay in her room by herself.  (Tr. 203-04).

Plaintiff testified that she spends her days sleeping and she watches Jerry Springer at night.  (Tr. 204).  Plaintiff stated that she only watches Jerry Springer on television.  (Id.).  Plaintiff testified that she spends a lot of time listening to music.  (Id.).  Plaintiff stated that she goes to bed at about 7:00 a.m., when she hears her father get up, and she wakes up when her mother wakes her about 7:00 p.m.  (Id.).  Plaintiff testified that she listens to rap music and draws pictures in her room.  (Tr. 205).  Plaintiff stated that she does not read because she has difficulty reading.  (Id.).

Plaintiff testified that when she leaves the house, she goes to McDonald's restaurant.  (Tr. 206).  Plaintiff stated that she drives her car to McDonald's.  (Id.).  Plaintiff testified that she has been involved in two car accidents.  (Id.).  Plaintiff stated that McDonald's is on the other side of her town.  (Id.).  Plaintiff testified that she goes to McDonald's to eat.  (Id.).  Plaintiff stated that she also goes to Wal-Mart.  (Id.).  Plaintiff testified that she usually only leaves the house once a week.  (Tr. 207).  Plaintiff stated that she spends the remainder of her time in her bedroom.  (Id.).

Plaintiff testified that she is "really depressed," and that she cries.  (Id.).  Plaintiff stated that she cries a lot because her "bubby" moved to Colorado earlier that year.  (Id.).  Plaintiff testified that she was only somewhat depressed before that time.  (Id.).  Plaintiff stated that she felt like she was alone and that no one cared about her.  (Tr. 208).  Plaintiff testified that she took

Celexa[2] for her depression, which did not help. (Id.). Plaintiff stated that she was taking a different medication at the time of the hearing. (Id.). Plaintiff testified that the new medication seems to help because she does not cry as much. (Id.). Plaintiff stated that she used to cry every night for about an hour. (Id.). Plaintiff testified that she only cried at night in her room because she did not want anyone to see her cry. (Tr. 209).

The ALJ next examined plaintiff's mother, Mrs. Gee, who testified that plaintiff likes to "self mutilate herself." (Id.). Mrs. Gee stated that plaintiff carves things into her arms and hands with safety pins. (Id.). Mrs. Gee testified that plaintiff has tried to commit suicide by cutting her wrists. (Id.). She stated that plaintiff recently burnt herself with an iron across her face. (Id.). Mrs. Gee testified that plaintiff has also pierced her lip. (Id.). Mrs. Gee stated that plaintiff has been engaging in self-mutilation for a while, although it became much worse six months prior to the hearing. (Tr. 210). Mrs. Gee testified that this occurred about the same time as the Colorado move. (Id.). Mrs. Gee stated that plaintiff used to burn her arm with a mixture of ice and salt and she would draw hearts on her arm with safety pins. (Id.).

Mrs. Gee testified that plaintiff's behavior worsened after Mrs. Gee's granddaughter moved in with them. (Tr. 211). Mrs. Gee stated that her granddaughter stole Xanax[3] from her mother and gave them to plaintiff. (Id.). Mrs. Gee testified that plaintiff tried to commit suicide by taking the Xanax. (Id.). Mrs. Gee stated that plaintiff also tried to sell Xanax at McDonald's.

---

[2]Celexa is indicated for the treatment of depression. See Physician's Desk Reference (PDR), 1344 (57th Ed. 2003).

[3]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. See PDR at 2794-95.

(Id.). Mrs. Gee testified that when the McDonald's manager told her that plaintiff was trying to sell Xanax to patrons, Mrs. Gee called the police and plaintiff was arrested. (Id.). Mrs. Gee stated that plaintiff was taken to jail because she was "out of control," hitting Mrs. Gee and the police officers. (Id.). Mrs. Gee testified that plaintiff was admitted to Twin Rivers, where she received inpatient psychiatric treatment, after she tried to overdose on the Xanax. (Tr. 212). Mrs. Gee stated that plaintiff had contact with police on about six other occasions for getting in fights at school and around town. (Id.).

Mrs. Gee testified that plaintiff's testimony regarding staying in her bedroom was accurate. (Tr. 213). Mrs. Gee stated that although plaintiff's counselor has recommended that plaintiff interact with the family, plaintiff is unwilling to leave her room. (Id.). Mrs. Gee testified that plaintiff will not talk to her or get out of bed when she wakes her. (Id.). Mrs. Gee stated that plaintiff only leaves the house once or twice a week. (Tr. 214). Mrs. Gee testified that plaintiff mostly goes to McDonald's and drives around town. (Id.). Mrs. Gee stated that plaintiff usually leaves for about 45 minutes. (Id.).

Mrs. Gee testified that plaintiff writes letters about committing suicide. (Id.). Mrs. Gee stated that she discovered the letters after plaintiff's suicide attempt and showed them to her doctor. (Id.). Mrs. Gee testified that plaintiff was committed after the showed the letters to plaintiff's doctor. (Id.). Mrs. Gee stated that the letters are not written to anyone in particular. (Tr. 215).

Mrs. Gee testified that plaintiff is taking Lexapro[4] for her depression, which helped

---

[4]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 3532.

initially. (Id.). Mrs. Gee stated that plaintiff's doctors want to increase her dosage of Lexapro because her body has become immune to it. (Id.). Mrs. Gee testified that plaintiff's counselor came to their home to talk to plaintiff but plaintiff would not come out of her room. (Id.). Mrs. Gee stated that plaintiff's counselor told her that plaintiff is more depressed now than she has ever been. (Id.). Mrs. Gee testified that she and her husband check on plaintiff throughout the night. (Id.). Mrs. Gee stated that Mr. Gee has installed bars on plaintiff's windows so she cannot sneak out. (Id.).

Mrs. Gee testified that plaintiff's asthma bothers her if she walks a lot or engages in a lot of activity. (Tr. 216). Mrs. Gee stated that plaintiff uses her asthma inhaler about four times a day. (Id.).

Mrs. Gee testified that she has to talk to plaintiff's principal about plaintiff returning to school the next school year. (Id.). Mrs. Gee stated that plaintiff has had a lot of problems with the assistant principal, Ms. Morgan. (Id.). Mrs. Gee testified that plaintiff has gotten into arguments with Ms. Morgan during which plaintiff had to be restrained. (Id.). Mrs. Gee stated that Ms. Morgan has disciplined plaintiff for dressing inappropriately because plaintiff wears shirts that are too small for her. (Tr. 217). Mrs. Gee testified that plaintiff responds by criticizing Ms. Morgan's clothing. (Id.).

Mrs. Gee stated that plaintiff has had trouble with her teachers as well. (Id.). Mrs. Gee testified that plaintiff's special education teacher, Ms. Dianna Manetz, called Mrs. Gee frequently because plaintiff disrupted class. (Id.). Mrs. Gee stated that plaintiff frequently argued with her classmates and got into physical fights with them. (Tr. 218).

Mrs. Gee testified that since plaintiff has been at home, she has been fighting with her brother and sister. (Id.). Mrs. Gee stated that plaintiff's brother punched plaintiff in the leg because plaintiff approached him and started kicking him. (Id.). Mrs. Gee testified that plaintiff fights with her brother or sister at least once a day. (Id.). Mrs. Gee stated that plaintiff swung her two-year old niece across the floor. (Id.). Mrs. Gee testified that plaintiff explained to her that the child hit her first. (Id.). Mrs. Gee stated that plaintiff does not understand that she cannot treat a two-year-old child in this manner. (Tr. 219). Mrs. Gee testified that plaintiff argues with her and Mr. Gee constantly. (Id.).

The ALJ next examined Mr. Gee, who testified that he tries to punish plaintiff but it is not effective. (Id.). Mr. Gee stated that plaintiff does not obey him when he punishes her. (Id.). Mr. Gee testified that plaintiff watches movies and television programs other than Jerry Springer. (Tr. 220). Mr. Gee stated that plaintiff wakes up at 7:00 p.m., rather than 7:00 a.m., and goes to bed at 5:00 a.m. (Id.). Mr. Gee testified that when plaintiff gets up during the day she fights with everyone in the house. (Id.).

The ALJ then re-examined plaintiff, who testified that she goes to bed at 7:00 a.m. and wakes up at 7:00 p.m. (Tr. 221). Plaintiff's mother stated that plaintiff only gets up at 7:00 p.m if Mr. and Mrs. Gee make her get up, otherwise she does not get up until between 9:00 and 10:00 p.m. (Id.). Mrs. Gee testified that plaintiff waits until everyone else is asleep before coming out of her room. (Id.). Mrs. Gee stated that she and Mr. Gee set their alarm clock so they can wake up during the night to check on plaintiff. (Id.). Mrs. Gee testified that plaintiff could sleep twenty hours a day if Mrs. Gee allowed it. (Tr. 222). Mrs. Gee stated that sleeping so much makes

plaintiff more depressed because she does not have contact with anyone. (Id.). Mrs. Gee testified

that no one wants to wake plaintiff because when they do, "it's nothing but a headache." (Id.).

**B.**    **Relevant Medical Records**

In a report dated August 25, 1999, Herbert L. Needleman, M.D. stated that at the age of

three, plaintiff was found to have an elevated blood lead level, and it persisted in the toxic range

for over two years. (Tr. 180). Dr. Needleman stated that plaintiff was found to have trouble with

expected cognitive and perceptual tasks in kindergarten. (Id.). He noted that plaintiff also had

observable difficulties in maintaining attention. (Id.). Dr. Needleman expressed the opinion that

plaintiff's learning difficulties were a result of her exposure to toxic levels of lead. (Id.). He stated

that plaintiff's outlook for future academic and vocational success was dim. (Id.).

Plaintiff presented to Wayne Medical Center on June 16, 2003, with complaints of right ear

pain. (Tr. 173). It was noted that plaintiff had tubes in her ears. (Id.). On July 22, 2003, plaintiff

complained of a left ear infection. (Tr. 171). Plaintiff was also diagnosed with asthma. (Tr. 172).

State agency medical consultants James Spence, Ph.D. and Jean J. Diemer, M.D.

completed an assessment of plaintiff's functioning on May 26, 2004. (Tr. 67-71). Drs. Spence

and Diemer expressed the opinion that plaintiff had less than marked limitations in the domains of

ability to acquire and use information and health and physical well-being; and no limitations in the

domains of attending and completing tasks, interacting and relating with others, moving about and

manipulating objects, and caring for yourself. (Tr. 68-69).

In a letter dated September 27, 2004, Pamla Moeller, LCSW stated that plaintiff was seeing

her for anger management counseling. (Tr. 156). Ms. Moeller stated that plaintiff has been

"significantly depressed for a couple of years." (Id.). She expressed the opinion that plaintiff met the full criteria for depression. (Id.). Ms. Moeller stated that plaintiff feels depressed most of the time, often crying herself to sleep at night. (Id.). Ms. Moeller reported that plaintiff has diminished enjoyment in activities, has gained forty pounds in two years, sleeps more than at night, feels tired all the time, feels like she does not fit in anywhere, has poor concentration, and has occasional thoughts of dying. (Id.). Ms. Moeller recommended that plaintiff see her primary care physician to be evaluated for an antidepressant. (Tr. 157).

In a note dated January 10, 2005, Ms. Moeller stated that plaintiff has significant problems with self-esteem, primarily due to an inability to control her anger. (Tr. 159). Ms. Moeller stated that plaintiff meets the criteria for attention deficit hyperactivity disorder[5] and oppositional defiant disorder.[6] (Id.). Ms. Moeller indicated that plaintiff had been unable to control her temper outbursts, which occur at school, at home, and when she is out with her friends. (Id.). Ms. Moeller stated that plaintiff becomes outraged very easily, especially if she feels she is being treated unfairly or when she does not get her way. (Id.). Ms. Moeller stated that a simple look or comment was enough to set plaintiff off. (Id.). Ms. Moeller reported that plaintiff was less physically violent at school at that time, but was still physically aggressive with her family. (Id.).

Plaintiff presented to Twin Rivers Medical Center on May 4, 2005, with complaints of suicidal thoughts. (Tr. 150). Plaintiff reported that she had taken Xanax in an attempt to kill

---

[5]A disorder of childhood and adolescence manifested at home, in school, and in social situations by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. Stedman's Medical Dictionary, 525 (27th Ed. 2000).

[6]A disorder of childhood or adolescence characterized by a recurrent pattern of negative, hostile, and disobedient behavior toward authority figures. Stedman's at 527.

herself, although she later stated that she did not intend to harm herself. (Id.). Plaintiff indicated

that she had been depressed for the past two months because her brother and best friend moved to

Colorado. (Id.). Plaintiff reported feeling depressed off and on since the age of nine or ten, and

severe depression for the past two months. (Id.). Plaintiff reported using marijuana and alcohol.

(Tr. 151). Plaintiff was assessed a GAF[7] of 38.[8] (Tr. 152). Plaintiff's diagnosis at discharge on

May 9, 2005 was: depression, not otherwise specified; and polysubstance abuse, with a GAF of

65.[9] (Tr. 148). Plaintiff was started on Lexapro. (Tr. 149). It was recommended that plaintiff

attend outpatient counseling. (Id.).

Plaintiff presented to licensed psychologist Ben Lanpher on May 31, 2005, for a

psychological evaluation at the request of the Commissioner. (Tr. 139-43). It was noted that

plaintiff was seeing Dr. Wiggs for psychiatric treatment and that she had been diagnosed with

Bipolar Disorder,[10] Oppositional Defiant Disorder, and Attention-Deficit/Hyperactivity Disorder.

---

[7]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[8]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

[9]A GAF score of 61-70 denotes some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 32.

[10]An affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression. Stedman's at 526.

(Tr. 140).  Dr. Lanpher stated that plaintiff was hospitalized for six days on May 4, 2005, for

exhibiting parasuicidal behaviors of taking Xanax and cutting her wrist.  (Id.).  He noted that

plaintiff self-mutilates often.  (Id.).  Dr. Lanpher administered the Weshsler Adult Intelligence

Scale, which revealed a full scale IQ of 74.[11]  (Tr. 141).  Dr. Lanpher stated that plaintiff's IQ

score is within the "borderline" range of intellectual ability.  (Id.).  Dr. Lanpher stated that plaintiff

appears to have memory difficulty manipulating auditory information.  (Tr. 142).  Dr. Lanpher

found that plaintiff exhibited a great deal of behavior problems, which seem to fit the symptoms

characteristic of borderline personality disorder.[12]  (Id.).  Dr. Lanpher described plaintiff's

symptoms as chronic self-mutilating behaviors, mood instability, identity disturbance, feelings of

emptiness, inappropriate and intense anger, and substance abuse.  (Id.).  Dr. Lanpher diagnosed

plaintiff with disruptive behavior disorder,[13] rule out bipolar disorder, borderline personality

disorder, and borderline intellectual functioning,[14] with a current GAF of 48[15] and the highest GAF

---

[11]An IQ range of 71-84 denotes Borderline Intellectual Functioning, whereas an IQ of 70 and below denotes Mental Retardation.  DSM-IV at 45.

[12]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone.  Stedman's at 526.

[13]A category of disorders characterized by conduct or oppositional defiant behaviors that do not meet the criteria for conduct disorder or oppositional defiant disorder.  DSM-IV at 94.

[14]Borderline intellectual functioning is denoted by an IQ in the 71-84 range.  See DSM-IV at 684.

[15]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

in the past year of 55.[16]  (Tr. 143).  Dr. Lanpher concluded that plaintiff was moderately impaired in her ability to understand and remember instructions, sustain concentration, and adapt to her environment; and markedly impaired in her ability to interact socially.  (Id.).  He expressed the opinion that plaintiff was incapable of handling awarded benefits responsibly.  (Id.).

In a letter dated June 8, 2005, Ms. Moeller, stated that plaintiff is "an emotionally volatile teenager."  (Tr. 134).  Ms. Moeller stated that plaintiff quit school because of her inability to get along with peers and authority figures.  (Id.).  Ms. Moeller reported that plaintiff has drastic mood swings with suicidal gestures and statements, and has recently been hospitalized after a suicide attempt.  (Id.).  Ms. Moeller indicated that plaintiff self-mutilates and has begun to experiment with drugs.  (Id.).  Ms. Moeller expressed the opinion that plaintiff will be unable to hold a job due to her anger problems.  (Id.).  Ms. Moeller stated that plaintiff also has problems with hyperactivity, impulsivity, poor concentration, and difficulty completing tasks.  (Id.).  Ms. Moeller diagnosed plaintiff with Attention Deficit Disorder and Oppositional Defiant Disorder, with many traits of Borderline Personality Disorder.  (Id.).  Dr. Moeller assessed a GAF of 35.  (Tr. 138).  She expressed the opinion that plaintiff "truly needs Disability, due to her intense emotional problems."  (Tr. 134).

## C.    **School Records**

Plaintiff's special education teacher, Dianna Manetz, completed an Individualized Education Program worksheet on May 2, 2003, when plaintiff was in the ninth grade.  (Tr. 84-86).

---

[16]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

Ms. Manetz indicated that plaintiff was learning disabled in the areas of written expression, reading comprehension, and math calculation. (Tr. 84). She stated that plaintiff had no problems with adaptive behavior, social and emotional skills, or speech and language skills. (Tr. 85). Ms. Manetz noted that plaintiff had taken the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) IQ test on two previous occasions and that her full scale IQ was 77 in 1996 and 84 in 1999. (Id.). Ms. Manetz reported the following grades for plaintiff's first semester freshman year: Language-72%, PE-89%, Government-68%, Math-78%, Choir-97%, and Science-74%. (Id.). Ms. Manetz reported that since enrolling in high school, plaintiff had good attendance, was fairly organized, and attempts to turn in assignments on time. (Id.). She also noted that plaintiff was able to work well independently and stay on task during assignments. (Id.). Ms. Manetz stated that plaintiff has been successful since entering the high school setting and was making progress in all of her academic classes. (Id.). She noted that plaintiff generally has a positive attitude toward school, is rarely absent, and has a desire to make good grades. (Id.).

On February 10, 2004, during her tenth grade school year, plaintiff was suspended for four days for fighting in school. (Tr. 121). It was noted that plaintiff was "developing violent behavior on a regular basis." (Id.).

Plaintiff received her first semester tenth grade report card on March 11, 2004. (Tr. 82). Plaintiff took courses in science, physical education, math, social studies, language arts, and mixed choir. (Id.). Plaintiff received four "B"s and two "C"s. (Id.).

On May 14, 2004, during plaintiff's tenth grade school year, Ms. Manetz completed a Teacher Questionnaire. (Tr. 72-79). Ms. Manetz indicated that she had been plaintiff's teacher for

two years and that she taught plaintiff four classes daily. (Tr. 72). Ms. Manetz stated that plaintiff was being taught at the fourth to sixth grade equivalency level. (Id.). Ms. Manetz indicated that plaintiff had a "serious problem" with comprehending and doing math problems, expressing ideas in written form, and learning new material; an "obvious problem" in understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, and recalling and applying previously learned material; and a "slight problem" with comprehending oral instructions, understanding and participating in class discussions, and applying problem-solving skills in class discussions. (Tr. 73). Ms. Manetz expressed the opinion that plaintiff had no problems with attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for herself. (Tr. 74-77). Ms. Manetz stated that she had not noticed any physical conditions that interfered with plaintiff's function at school. (Tr. 78).

### The ALJ's Determination

The ALJ made the following findings:

1. The child was born on February 16, 1988 and is currently 17 years old.

2. The child has not engaged in substantial gainful activity throughout the pertinent period in this case.

3. The claimant has the following "severe" impairments: disruptive behavior disorder (NOS), borderline personality disorder, learning disorder, oppositional defiant disorder, and asthma.

4. The subjective complaints in this case are considered credible only to the extent they are supported by the evidence of record as summarized in the text of this decision.

5. The claimant's impairments do not meet or medically equal the severity of any

impairment listed in Part B of Appendix 1 to Subpart P, (20 CFR §§ 416.924(d)(1), 416.925 and 416.926).

6.     The child does not have an "extreme" limitation in any domain of functioning or "marked" limitations in two domains of functioning. Thus, the claimant's condition does not functionally equal the severity of the listings.

7.     Accordingly, the claimant is "not disabled" and has not been under a "disability," at any time through the date of this decision.

(Tr. 23).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application protectively filed on March 30, 2004, the child is not eligible for supplemental security income payments under Sections 1602 and 1614(a)(3)(C) of the Social Security Act.

(Id.).

## Discussion

### I.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## II.    The Determination of Disability

A child is considered disabled if that child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" and which lasts for a period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i),(ii).  The Commissioner has established a three-step process for determining whether a child is disabled under the Social Security Act.  See  20 C.F.R. § 416.924.  Under the first step, it is determined whether the child was engaged in substantial gainful activity.  If substantial gainful activity is being performed, then a finding of no disability is warranted.  See 20 C.F.R. §§ 416.924(b).  Next, it is determined whether the child's impairments are severe.  See 20 C.F.R. §§ 416.924(c).  If a severe impairment is found, the next issue is whether the child's impairment meets or medically equals a listed impairment found in Appendix One to 20 C.F.R. 404.  See 20 C.F.R. §§ 416.924(d); 20 C.F.R. pt. 404, subpt. P, App. 1.  If it is determined that the impairment does not meet or medically equal a listing, then the final consideration is whether the child's impairment "functionally equals" a listed impairment. See 20 C.F.R. § 416.924(d).

An ALJ is to evaluate, in determining functional equivalence, a child's functional limitations in: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and

relating with others, (4) moving about and manipulating objects, (5) caring for himself/herself, and (6) health and physical well-being. See 20 C.F.R. § 416.926a (b)(1)(I)-(vi). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains or an "extreme" limitation in one domain. See 20 C.F.R. § 416.926a(d).

A "marked" limitation is a limitation which is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a (e)(2)(I). A "marked" limitation can also be "equivalent to standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

An "extreme" limitation is "more than marked," and is given "to the worst limitations," although it need not necessarily mean a total lack or loss of ability to function. 20 CF.R. § 416.926a(e)(3)(I).

### III.    Plaintiff's Claims on Appeal

Plaintiff raises two claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ erred in finding plaintiff not disabled because the record demonstrates that plaintiff's combination of impairments functionally equals a listing level impairment. Plaintiff argues in the alternative that the ALJ erred in failing to fully and fairly develop the record.

#### Functional Equivalence

Plaintiff argues that the record demonstrates that her combination of impairments functionally equals a listing level impairment. Specifically, plaintiff contends that she suffers from an extreme limitation in the domain of "interacting and relating with others," or marked limitations

in two or more domains of functioning.  The undersigned will assess each domain of functioning in turn.

### 1.    Acquiring and Using Information

This domain considers how well the child acquires or learns information, and how well the child uses the information learned.  <u>See</u> 20 C.F.R. § 416.926a(g) (2006).

The ALJ found that plaintiff had less than marked limitations in the "acquiring and using information" domain of functioning.  (Tr. 20).  The ALJ stated that plaintiff's special education teacher, Ms. Manetz, has assessed problems with comprehending and completing math problems and expressing ideas in written form, although she did not find any "very serious problems."  (Tr. 20, 84-85).  The ALJ noted that plaintiff's intelligence has been assessed in the borderline range rather than the mild mentally retarded range.  (Tr. 20, 85, 141).  The ALJ pointed out that plaintiff was in regular class rooms 57 percent of the time in the 2003 school year and was receiving passing grades.  (Tr. 20, 84).  The ALJ stated that the state agency physicians expressed the opinion that plaintiff had less than marked limitations in this domain of functioning.  (Tr. 20, 68-69).

The undersigned finds that substantial evidence supports the ALJ's determination that plaintiff had less than marked limitations in the domain of acquiring and using information.  The evidence cited by the ALJ, namely the report of plaintiff's special education teacher, plaintiff's report cards, and IQ tests, reveal that plaintiff has limitations that are less than marked in this domain.

## 2. Attending and Completing Tasks

This domain considers how well the child focuses and maintains attention; begins, carries through, and finishes activities (including the pace activities are performed); and the ease with which the child changes activities. See 20 C.F.R. § 416.926a(h) (2006).

The ALJ found that plaintiff had no limitations in the "attending and completing tasks" domain of functioning. (Tr. 20). The ALJ stated that, although plaintiff has difficulty with acquiring and using information, plaintiff appears to be able to maintain focus and carry through with projects she understands. (Id.). The ALJ noted that plaintiff's special education teacher, Ms. Manetz, along with state agency physicians, expressed the opinion that plaintiff had no limitations in this area of functioning. (Id.).

The undersigned finds that the ALJ's determination that plaintiff has no limitations in this domain of functioning is supported by substantial evidence in the record. There is no indication in the record that plaintiff has more than minimal problems with attending and completing tasks.

## 3. Interacting and Relating with Others

This domain considers how well the child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. See 20 C.F.R. § 416.926a(I) (2006).

The ALJ found that plaintiff had marked, but not extreme, limitations in the "interacting and relating with others" domain of functioning. (Tr. 21). The ALJ stated that plaintiff has been assessed with a disruptive behavior disorder, borderline personality disorder, and oppositional

defiant disorder. (Id.). The ALJ noted that plaintiff does not like being around people, often gets into fights with peers, does not respect authority, and has a poor relationship with her parents. (Id.). The ALJ stated that plaintiff has also been assessed with mood instability, identity disturbance, feelings of emptiness, and inappropriate anger. (Id.). The ALJ thus acknowledged that plaintiff has significant limitations interacting and relating to others. (Id.).

The ALJ, however, stated that plaintiff has responded at times to treatment. (Id.). For example, the ALJ noted that after treatment at Twin Rivers Medical Center, plaintiff's GAF was assessed at 65, which indicates only mild symptoms. (Id.). The ALJ expressed the opinion that some of plaintiff's difficulties are "simply related to her being a teenager and having to deal with significant family dysfunction." (Id.). Finally, the ALJ pointed out that plaintiff's teacher, Ms. Manetz, and the state agency physicians found no limitations in this domain of functioning, indicating that plaintiff has had "at least some periods when her ability to interact and relate to others has been appropriate." (Id.).

Plaintiff argues that the evidence clearly demonstrated that plaintiff suffered from extreme limitations in the domain of interacting and relating with others. Plaintiff cites plaintiff's expulsion from school for fighting, encounters with police, and relationship with her parents, as examples of plaintiff's extreme limitations in this domain. Plaintiff notes that Dr. Lanpher found that plaintiff was exhibiting significant behavior problems, and diagnosed plaintiff with disruptive behavior disorder/rule out bipolar disorder, and borderline personality disorder, and assessed a GAF of 48. (Tr. 142-43). Plaintiff also points out that plaintiff's counselor, Ms. Moeller, described plaintiff as an "emotionally volatile teenager," and found that plaintiff was unable to get along with peers and

authority figures.  (Tr. 134).

The undersigned finds that the ALJ's determination that plaintiff suffers from marked, but not extreme, limitations in the domain of interacting and relating with others is supported by substantial evidence.  As discussed above, a "marked" limitation is defined as a limitation which is "more than moderate" but "less than extreme," whereas an "extreme" limitation is "more than marked," and is given "to the worst limitations."  20 C.F.R. §§ 416.926a (e)(2)(I), 416.926a(e)(3)(I).  Plaintiff clearly has significant limitations, which are "more than moderate," in this domain, as is demonstrated by her suspensions from school, her relationship with her family, and the treatment notes of both her counselor and the consulting psychologist.

As the ALJ pointed out, however, there is also evidence in the record that ameliorates the severity of plaintiff's limitations in this domain.  In May of 2003, plaintiff's special education teacher, Ms. Manetz, indicated that plaintiff had no problems with adaptive behaviors or social and emotional skills.  (Tr. 85).  Ms. Manetz also stated that plaintiff had been making progress in her classes, had a generally positive attitude toward school, and a desire to make good grades.  (Id.).  Plaintiff was suspended for four days for fighting on February 10, 2004.  (Tr. 121).  In May of 2004, however, Ms. Manetz indicated that she had not observed any problems interacting and relating with others.  (Tr. 75).  As such, it appears that plaintiff generally interacted appropriately with other students in the classroom setting.  This finding is supported by Ms. Moeller's January 2005 statement that plaintiff was "less physically violent at school."  (Tr. 159).  Further, although consulting psychologist Dr. Lanpher found that plaintiff had significant mental impairments and assessed a GAF of only 48, he expressed the opinion that plaintiff had marked rather than extreme

limitations in the ability to interact socially. (Tr. 143). Thus, the ALJ's determination that plaintiff had marked rather than extreme limitations in the domain of interacting and relating with others is supported by substantial evidence in the record.

**4.      Moving About and Manipulating Objects**

This domain considers how well the child moves her body from one place to another and how the child moves and manipulates things. See 20 C.F.R. § 416.926a(j) (2006). These are called gross and fine motor skills. (Id.).

The ALJ found that plaintiff had no limitations in this domain. This finding is supported by substantial evidence and plaintiff does not dispute the finding in this action.

**5.      Caring for Yourself**

This domain considers how well the child maintains a healthy emotional and physical state, including how well the child gets her physical and emotional wants and needs met in appropriate ways; how the child copes with stress and changes in her environment; and whether the child takes care of her own health, possessions, and living area. See 20 C.F.R. § 416.926a(k) (2006).

The ALJ found that plaintiff had some more than slight, but less than marked, limitations in this domain of functioning. (Tr. 22). The ALJ stated that the record reveals that plaintiff is able to take care of her own personal needs. (Id.). The ALJ acknowledged that plaintiff has displayed "difficulties dealing with stress as well as bad judgment with her drug use and stealing." (Id.). The ALJ, however, noted that plaintiff's teacher and the state agency physicians have found no limitations in this domain of functioning.

The regulations specifically address self-injurious actions, such as suicide attempts, in the

domain of caring for oneself. The regulations list examples of limited functioning in caring for oneself. Such examples include: "[y]ou engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules," "[y]ou do not spontaneously pursue enjoyable activities or interests," and "[y]ou have disturbance in eating or sleeping patterns." 20 C.F.R. § 416.926a(k)(3) (2006). Suicidal behavior must be considered in the area of personal functioning and not in the area of social functioning. See Garrett v. Barnhart, 366 F.3d 643, 652-53 (8th Cir. 2004) (ALJ's improper consideration of fifteen-year-old claimant's suicide attempts in evaluation of his impairment in social functioning and failure to consider them in considering personal functioning warranted remand).

The undersigned finds that the ALJ's determination that plaintiff suffers from less than marked limitations in the domain of caring for herself is not supported by substantial evidence in the record. The ALJ cites to the report of plaintiff's teacher and the opinion of the state agency physicians as support for his finding. State agency medical consultants James Spence, Ph.D. and Jean J. Diemer, M.D. completed an assessment of plaintiff's functioning on May 26, 2004, based upon a review of plaintiff's records. (Tr. 67-71). As discussed above, plaintiff's teacher, Ms. Manetz, provided assessments in May of 2003 and May of 2004. (Tr. 84-86, 72-79).

All the evidence dated after the reports of Ms. Manetz and the state agency physicians reveals a worsening in plaintiff's condition and supports the presence of a marked impairment in the domain of caring for yourself. In a letter dated September 27, 2004, plaintiff's counselor, Ms. Moeller, stated that plaintiff felt depressed most of the time, often cried herself to sleep at night, had diminished enjoyment in activities, gained weight, slept more than at night, felt tired all the

time, felt like she does not fit in anywhere, and had occasional thoughts of dying. (Tr. 157). On January 10, 2005, Ms. Moeller stated that plaintiff had significant problems with self-esteem, and that she met the criteria for oppositional defiant disorder. (Tr. 159). Plaintiff was admitted to Twin Rivers Medical Center on May 4, 2005, after a suicide attempt. (Tr. 150). It was noted that plaintiff had been suffering from severe depression for about two months. (Id.). Plaintiff was assessed a GAF of 38 at the time of her admission and a GAF of 65 upon discharge. (Tr. 152, 148). Plaintiff saw Dr. Lanpher on May 31, 2005, at which time he noted that plaintiff exhibited parasuicidal behaviors and self-mutilated often. (Tr. 140). Dr. Lanpher diagnosed plaintiff with disruptive behaviors disorder, borderline personality disorder and assessed a GAF of 48. (Tr. 143). On June 8, 2005, Ms. Moeller described plaintiff as an "emotionally volatile teenager." (Tr. 134). Ms. Moeller stated that plaintiff has drastic mood swings with suicidal gestures and statements, plaintiff self-mutilates, and plaintiff has begun to experiment with drugs. (Id.). Ms. Moeller diagnosed plaintiff with oppositional defiant disorder, with many traits of borderline personality disorder, and assessed a GAF of 35. (Tr. 138). At the hearing, plaintiff's mother testified that plaintiff frequently engages in self-mutilation behavior, including cutting and burning her arms, and burning her face with an iron. (Tr. 209-10).

The evidence discussed above reveals that plaintiff experienced suicidal thoughts and engaged in suicidal behavior, including an attempted overdose of Xanax and cutting her wrists. Plaintiff also frequently engaged in self-mutilation behavior. Such overwhelming evidence of self-injurious behavior is indicative of marked limitations in the domain of caring for yourself. In addition, the testimony of plaintiff and her parents indicates that plaintiff did not engage in any

activities but rather stayed in her room all day and slept. This testimony indicates that plaintiff did not "spontaneously pursue enjoyable activities or interests," and had a disturbance in sleeping patterns, which are also examples of limited functioning in the domain of caring for yourself. The ALJ erred in failing to discuss any of this evidence in considering plaintiff's limitations in this domain. As such, the ALJ's determination that plaintiff had less than marked limitations in this domain is not supported by substantial evidence. Rather, the evidence is supportive of marked limitations in the domain of caring for yourself.

### 6.    Health and Physical Well-Being

This domain considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on a child's functioning that are not considered in the moving about and manipulating objects domain. See 20 C.F.R. § 416.926a(l) (2006).

The ALJ found that plaintiff had less than marked limitations in the health and physical well-being domain of functioning. (Tr. 22). The ALJ stated that plaintiff suffers from breathing difficulties and has been diagnosed with asthma, although the impact of plaintiff's asthma has been relatively mild. (Id.). This finding is supported by substantial evidence in the record. Although plaintiff has a history of lead poisoning and asthma, there is no indication in the medical record that these impairments cause any significant limitations.

### Conclusion

As discussed above, the overwhelming evidence reveals that plaintiff suffers from a marked impairment in the domain of caring for yourself. The ALJ erred in failing to consider plaintiff's self-injurious behavior when assessing plaintiff's limitations in this domain. The ALJ properly

found that plaintiff suffers from marked limitations in the domain of interacting and relating with others. As such, plaintiff's impairments functionally equal a listed impairment. In this case, where the record "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." <u>Cline v. Sullivan</u>, 939 F.2d 560, 569 (8th Cir. 1991). Accordingly, the undersigned recommends that this matter be reversed and remanded to the Commissioner for the award of Supplemental Security Income benefits.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C.

§ 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for the award of Supplemental Security Income benefits.

The parties are advised that they have eleven (11) days, until August 31, 2007, in which to file

written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless

an extension of time for good cause is obtained, and that failure to file timely objections may result

in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th

Cir. 1990).

Dated this   20th   day of August, 2007.

<br>

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE